## MONMOUTH COLLEGE, Appellant, v. THOMAS J. DOCKERY.

**In Banc, March 28, 1912.**

1. **PARTNERSHIP: Fraud by One Partner: Liability of Other.**
   For the act of a partner, done in the name of the firm and within
   the scope of the partnership business, the other member of the
   firm is liable; and the fact that he himself has done no wrong,
   is immaterial. One partner has authority to bind the firm in
   all transactions within the scope of the partnership business;
   and the misrepresentation of facts, made by one partner to a
   client of the firm who is held out to such client by the other as
   authorized to act for the firm, is binding on the firm; and if
   that other partner represents, within the scope of the firm's
   business, that the title to a piece of land is good in the fictitious
   owner, and thereby the client is induced to loan money thereon,
   which is appropriated by the defaulting partner who in the name
   of the firm has the transaction in hand, the firm and the other
   partner are liable for the money.

2. ———: ———: ———: **Mortgage: Agreement for Abstract
   of Title.** An agreement that, before any notes secured by a
   deed of trust were sold, an abstract of all conveyances of record
   affecting the title to the land should be furnished to the pur-
   chaser, showing that the deed of trust securing the notes was
   recorded and the title approved by the purchaser or his attor-
   ney, is one made in the interest of and as a protection to the
   purchaser, and a failure by the purchaser to require these things,
   will not relieve the partner of the man who conducted the trans-

action and imposed a forged and fraudulent note on the purchaser, from reimbursing the loss due to the false representations. Besides, in this case, there is no substantial evidence of such an agreement.

3. ——: ——: ——: **Sharing Commissions with Purchaser.** An honest agreement by the firm making the loan to share the commissions with the lender's treasurer, is immaterial when the firm is sued for fixing up and imposing on the lender a fictitious and fraudulent note. If it was not honest, but a part of a scheme to defraud the lender, entered into by its treasurer and the firm, then the firm was a party to it, and it is still no defense to any member of the firm.

4. ——: ——: ——: **Negligence of Lender.** The defrauded member of the firm making the loan has no right to complain of the negligence of the lender in not sooner discovering the fraud if he himself, having the means at hand, did not sooner discover it. The partner who has done no wrong cannot be heard to charge the lender with such negligence unless the defrauding partner could make it.

5. **FRAUD: Limitations: Discovery: Pleading.** It is not always necessary for a plaintiff, in an action for fraud and deceit, to which the defense of the Statute of Limitations is interposed, to aver that he used diligence to discover the fraud, because if he had no reason to suspect fraud he was not called upon to investigate. And if he merely states that he did not discover the fraud until a certain date, and the defendant, without questioning the sufficiency of the pleading, goes to trial on that issue, and evidence is heard tending to show that it was the conduct of the defendant that allayed suspicion, the defendant cannot, on appeal, complain of the defect in the pleading.

*Held,* by WOODSON, J., dissenting, that in order for plaintiff to avail itself of the exception to the Statute of Limitations which prevents it from running, it was necessary to plead it; and that necessity for the plea was not waived by defendant, for when evidence was offered to sustain the exception the defendant objected, and one objection is enough.

6. ——: ——: ——: ——: **Defects Available on Appeal: No Demurrer.** It is only when a pleading fails to state a cause of action or a defense, or fails to show jurisdiction in the court, that the defect can be complained of for the first time in the appellate court. And an objection to a petition that it does not state a cause of action, made after the answer is filed and just as the trial is about to begin, and which comes then only in the form of an objection to the introduction of any evidence, is not entitled to as favorable a consideration as a general demurrer timely interposed. In such case, if by

reasonable inference from the facts stated, a cause of action can be constructed, it is the duty of the court to do so.

7. ———: ———: **Plea: No Reply: Practice: Appeal.** A party may, if he choose, anticipate a plea of the Statute of Limitations and state facts in his petition to avoid it; but the usual course is to wait until the answer is filed pleading the statute, and then avoid it by a reply. But in such case if plaintiff should fail to file a reply to the plea and the cause goes on to trial and proof is introduced avoiding the statute, and the issue is tried as if a sufficient reply was on trial, the losing party cannot raise the objection in the appellate court that the issue was not properly presented in the pleadings.

8. ———: ———: **Concealment: Diligence: Partners.** The law does not require of one that he should suspect fraud; on the contrary, all transactions are presumptively honest. Where there has been concealment, or where there is a relationship of trust and confidence, or where there is nothing in the transaction at the time the fraud is perpetrated, and nothing occurring later, to cause a reasonably prudent man to suspect fraud, he is not guilty of negligence in failing to ferret it out. On the other hand, the law requires the defrauded person to be reasonably watchful of his interests, and will not relieve him from it if he has been negligent in that respect.

Where a firm had in a course of dealing running through two or three years been trusted with absolute faith by a college in the loaning of its money, and soon after it had begun making loans through the agency of the firm sent its representative to inquire into the firm's standing in the community and to view the securities, and was assured by the defendant partner that the other partner had the business of these loans in hand, and then after the confidence of the college was entirely obtained, the other partner used an impecunious person named Smith to obtain a loan on his own land and had the notes signed by Smith, and in the firm name certified that there were no mortgages or liens on the land except the deed of trust securing this loan to Smith, which had been assigned to the firm, that the title was good in Smith and the deed of trust recorded, and when the notes were received by the college it honored the firm's draft, and thereupon the defaulting partner placed the amount to the firm's credit and checked it out, and paid the interest for three years, concealing the whole transaction from defendant and the college for that length of time, the college cannot be held to be negligent of its duty in not sooner discovering the fraud, and the Statute of Limitations did not begin to run against the college when the fraud was first perpetrated, but only upon its discovery by the college.

College v. Dockery.

*Held*, by WOODSON, J., dissenting, (1) that the loss occurred through the negligence of the college in not demanding for three or four years the deed of trust which it was agreed should be furnished to it as security for the loan; and (2) the most ordinary business prudence on the part of the college would have exposed the fraud, and when so exposed the five-year Statute of Limitations would have at once begun to run, and the suit is barred on that theory.

*Held*, by GRAVES, J., dissenting, that knowledge by the defrauded party of facts which in the exercise of proper prudence and diligence would enable him to learn of the fraud, is usually deemed equivalent to the discovery of fraud; and applying this rule, the facts show that the well established rule of doing business between the college and the partnership required the firm to forward to the college, along with the notes, an abstract of title, a certificate of title of a certain firm of attorneys, and a deed of trust recorded, and a failure to forward any of these things within a reasonable time was sufficient to put the college, or any prudent person, upon inquiry, and to start the Statute of Limitations to running.

*Held*, by BROWN, J., dissenting, that the college might have waived the delivery of the abstract of title and the certificate of their attorneys, in view of the certificate of the firm, who were abstracters, that the title was vested in Smith; but as it had always been the custom for the college to receive a deed of trust whenever it made a loan, and none was sent in this case and no inquiry was made why it was not sent, and no investigation was made, the college was guilty of gross negligence, which was sufficient to set the statute to running.

9. **PARTNERSHIP: Scope of Authority: Finding of Fact.** A finding by the trial judge sitting as a jury that the defaulting partner acted outside the scope of his authority, is not a finding of fact, but is only an opinion on a point of law.

10. **FRAUD AND DECEIT: Appellate Practice: Simple Reversal.** Where all the facts are before the court in an action of fraud and deceit, tried by the court sitting as a jury, there is no necessity for a new trial; and the judgment for defendant being wrong, it will simply be reversed, and the trial court directed to enter judgment for plaintiff.

Appeal from Adair Circuit Court.—*Hon. Nat M. Shelton*, Judge.

REVERSED AND REMANDED (*with directions*).

*Campbell & Ellison, Safford & Graham,* and *Gage, Ladd & Small* for appellant.

(1)   A partner is liable for the fraud of his co-partner if committed in the name of the partnership and within the apparent scope of the partnership business, although he be entirely ignorant of it, receive no benefit from it and the fruits of the fraud are appropriated by his copartner to his own use. Story on Partnership (7 Ed.), secs. 108, 166; Bates on Partnership, sec. 476; Lindley on Partnership (Ewell's Ed.), p. 314; Hayner v. Crow, 79 Mo. 293; Winship v. Bank, 5 Pet. 566; Church v. Sparrow, 5 Wend. 223; Gilchrist v. Blande, 58 Wis. 184; Wolf v. Mills, 56 Ill. 360; Tenney v. Foote, 95 Ill. 908; Bank v. Kinnare, 174 Ill. 358; Darlington v. Garrett, 14 Ill. App. 243; Alexander v. State, 56 Ga. 478; Wine Co. v. Weippert, 14 Mo. App. 483; Grocery Co. v. Cole, 26 Mo. App. 5; Dudley v. Love, 60 Mo. App. 420; Sadler v. Lee, 6 Beavan, 324; Eager v. Burnes, 31 Beavan, 579; St. Aubyn v. Smart, L. R. 5 Eq. Cas. 183; Rhodes v. Moules, L. R. (1895) 1 Ch. 236; Lindu v. Crowley, 29 Kan. 756; Pahlman v. Taylor, 75 Ill. 629; Boardman v. Gore, 15 Mass. 331; Burgess v. Bank, 4 W. P. D. Bush (Ky.) 600; Coleman v. Pearce, 26 Minn. 123; Iron Co. v. Harper, 41 Ohio St. 101; Jackson v. Todd, 56 Ind. 406; Todd v. Jackson, 75 Ind. 272.   (2)   This court will set aside a verdict of a jury or a finding of a trial court unless the same is supported by substantial evidence. Whitsett v. Ransom, 79 Mo. 258; Garrett v. Greenwell, 92 Mo. 120; Long v. Moon, 107 Mo. 334; Nugent v. Milling Co., 131 Mo. 252; Payne v. Railroad, 136 Mo. 580; Sanguinette v. Railroad, 196 Mo. 494; Weltmer v. Bishop, 171 Mo. 116; Avery v. Fitzgerald, 94 Mo. 207; Flynn v. Wacker, 151 Mo. 552; Champagne v. Hamey, 189 Mo. 726; State v. King, 203 Mo. 571; Deane v. Transit Co., 192 Mo. 585; Story v. Story, 188 Mo. 129; Hethcock v. County, 200 Mo.

170; Brewing Co. v. St. Louis, 209 Mo. 600; Bond Co. v. Houck, 213 Mo. 440; Efron v. Car Co., 59 Mo. App. 645; Meier v. Proctor & Gamble Co., 81 Mo. App. 419; Stafford v. Adams, 113 Mo. App. 721; Joy v. Cale, 124 Mo. App. 576; Pickens v. Railroad, 125 Mo. App. 674; Schaub v. Railroad, 133 Mo. 448; Com. Co. v. Aaron, 130 S. W. 118. (3) There is no substantial evidence to support the finding of the court as to an arrangement or an agreement between plaintiff's treasurer and Dockery & Hilbert, as to the method or plan by which loans were to be made by Dockery & Hilbert for the plaintiff; and that finding ought to be set aside. (4) Even if an arrangement or agreement regarding the method of conducting the loan business had been made between the plaintiff and Dockery, as found by the court, it could have afterwards been modified, or compliance with its terms waived by the parties; and it was so modified and waived. Bank v. Lonergan, 21 Mo. 46; Hays v. Bank, 101 Ky. 201. (5) There is no substantial evidence to support the finding of the court as to the method pursued in all other loan transactions with the plaintiff; and that finding ought to be set aside. (6) The court erred in finding that the transaction was without the scope of the authority of Hilbert. There is no evidence in support of that finding. (7) The court erred in finding the plaintiff guilty of negligence and of failure to exercise ordinary diligence. There is no evidence to support the finding. (8) The conclusion of law by the circuit court that the action was barred by the Statute of Limitations, was error.

*Higbee & Mills* and *Morton Jourdan* for respondent.

(1) In view of the allegations as to the course of business adopted between plaintiff and defendants, the presumption must be that the plaintiff relied upon the certificate and guarantee of title, and not the rep-

resentations made in the application, nor the letter accompanying the application. The money was paid after the receipt of the certificate of title. The petition charges that at the time the notes were presented defendants falsely represented that the notes were secured by a deed of trust which is a first lien on said lands. This evidently refers to the certificate of title. (2) All prior and contemporaneous representations as to title were merged in this certificate and guarantee of title, which was received and accepted by plaintiff before the money was paid, and the suit should have been based on the false certificate and guarantee of title. It was the final representation. No money was parted with upon the representations of title contained in the application, or the letter accompanying it. Of course, the application was approved, upon condition that an approved abstract of title should be furnished. The money was paid upon the certificate of title, which was the sole and final expression of the will and agreement of the parties, and becomes the only admissible evidence of the contract. 21 Am & Eng. Ency. Law (2 Ed.), 1079; Ringer v. Holtzclaw, 112 Mo. 523; Kellerman v. Railroad, 136 Mo. 189; Standard Co. v. St. Louis Co., 177 Mo. 571; State v. Chinn, 19 Mo. 233; State v. Evers, 49 Mo. 545; State v. Bohle, 182 Mo. 58; 2 Parson's Contracts (8 Ed.), p. 545; Graham v. Sadlier, 165 Ill. 95. Hence the suit should have been bottomed upon the false certificate and guarantee of title, and not against defendant individually. (3) There was substantial evidence to support the finding of the court that the transaction was without the scope of the authority of Hilbert, and so known to plaintiff and its treasurer at the time. Plaintiff had no right to make a loan on a certificate of title. Plaintiff alleges in its petition that there was a course of business adopted; that the blank application for loans should be filed "with a description of the security offered for proposed loans," and "plain-

tiff accepting the representations of said defendant firm, concerning the character and value of the security offered, and the character of the proposed borrower, as being true.'' The evidence is unquestioned that in every other loan transaction defendants submitted abstracts of title approved by Ellison & Campbell. Whether the act of Hilbert was within the scope of his authority or was consented to by Dockery, was a question of fact. 22 Am. & Eng. Ency. Law (2 Ed.), 139 (c); Dowling v. Bank, 145 U. S. 512; Deardorf v. Thatcher, 78 Mo. 128. (4) Plaintiff's reckless disregard of the course of procedure adopted, and to be followed in the making of loans, and its laches in not requiring an abstract of title, and in not calling for the deed of trust, estops it from prosecuting this action. Defendant was grossly prejudiced by plaintiff's negligence. It is such laches as will defeat plaintiff's action. Laches is such neglect or omission to assert a right as taken in conjunction with lapse of time more or less great, and other circumstances causing prejudice to an adverse party, operates as a bar in a court of equity. 18 Am. & Eng Ency. Law & Proc. (2 Ed.), 97, 100; Kline v. Vogel, 90 Mo. 239; Newman v. Newman, 152 Mo. 398; Hudson v. Cahoon, 193 Mo. 457; Loomis v. Railroad, 165 Mo. 469. (5) If an abstract of title had been prepared in this case, Dockery would have known it, and defeated the fraud. (6) This action is barred by the fifth clause of the Statute of Limitations. There is no averment of any effort to discover the fraud, or any trick or artifice to conceal it. The petition therefore shows on its face that the cause of action was barred by the five-year Statute of Limitation. County v. Bragg, 135 Mo. 291; Callan v. Callan, 175 Mo. 346; Stark v. Zehnder, 204 Mo. 442; Loomis v. Railroad, 165 Mo. 494; 19 Am. & Eng. Ency. Law (2 Ed.), 250, 252; Hudson v. Cahoon, 193 Mo. 547; Teall v. Schroder, 158 U. S. 172; Clark v. Leon,

241 Mo.—34

108 Iowa, 250; Felix v. Patrick, 145 U. S. 317; Hart v. Heidweyer, 152 U. S. 547. (7) Payment of interest not pleaded nor relied upon to take the case out of the Statute of Limitations.

VALLIANT, C. J.—Plaintiff, an Illinois corporation, sues to recover $12,000, with interest, which it alleges was obtained from it by defendant through fraud and deceit. It is not disputed that the money was obtained from the plaintiff by fraud and deceit and it is not charged that defendant Dockery was, in person, guilty of any of the fraud or deceit that was practiced in the transaction, or that he did in person obtain any of the money in question. But defendant was a member of a business firm or copartnership doing business under the name and style of Dockery & Hilbert, and the fraud was practiced in the name of the firm by Hilbert, defendant's partner, and the money was obtained by Hilbert in the name of the firm, without the knowledge of defendant Dockery. It is, therefore, a case in which one of two innocent parties must suffer, and the question is, must the defendant suffer for the wrongdoing of his partner or must the plaintiff suffer from the wrongdoing of defendant's partner?

There is no dispute about the main facts in the case. At the time of this transaction and for several years prior, defendant and Edwin L. Hilbert were partners in trade under the style and firm name of Dockery & Hilbert. Their business was dealing in real estate, making and negotiating loans on real estate, etc. They did the largest business of that kind that was done in Kirksville, Missouri, where they lived. Their personal and commercial reputation was of the very best; even Hilbert, for integrity and financial strength, was, at that time and for two or three years thereafter, highly esteemed among business people in Kirksville.

They also conducted a title abstract business in the name of the Dockery & Hilbert Abstract Company, a corporation in which they owned practically all the stock and of which defendant Dockery was president and Hilbert was secretary. The business of that concern was conducted in the office of the firm. In the name of that corporation abtracts and certificates of title were issued and used by the firm in their business of dealing in real estate and making loans.

They also allowed an insurance business to be conducted in their office and in the name of their firm, by a young lady who was an employee of theirs, and the bank account relating to that business was kept in the firm name, the deposits and checks being made by Hilbert in the firm name, but the business was owned by the employee who conducted it and they had no interest in it.

They advertised their business as real estate, loans, insurance, law and abstracts.

The plaintiff began having money lending transactions with the firm of Dockery & Hilbert as early as 1899, and had made several loans through them before the loan in question in this case. By these previous transactions the plaintiff's confidence in the firm seems to have been so well established that it made them its exclusive agents for placing loans in Adair and other counties, as the following letter from the firm to the then treasurer of the college indicates:

Kirksville, Mo., 7—21—1899.

Mr. R. A. Wilson,
    Monmouth, Ill.

Dear Sir: We are in receipt of your communication on the 20th inst., in which you state to us that you were somewhat disappointed on failure to receive money due The Monmouth College and that the same will not be in readiness for you before the 30th of this month. In answer to your inquiry will say that it will be no inconvenience for us to advance the money in this loan and then we can assign the papers to you.

We thank you for the invitation to continue to forward to you good applications, which we will do. We will give you a $2200 loan

on the early part of this coming week. We also have several other loans which we hope to close for you in the near future.

We would like, if agreeable to you, to enter into an arrangement by which we could become your financial agents for Adair and adjoining counties. It appears to us that it would be more satisfactory to both ourselves and you to have an arrangement of this kind, as we could understand each other better, and on our part of it it would do away with the embarrassment of having to compete with several agents working for the same firm as ours. If you can see your way clear to make us your exclusive agents for Adair and adjoining counties, we will guarantee you that we will loan your money in a very short time and on the most desirable securities for the rate obtained. Hoping we will be able to complete an arrangement such as suggested by this letter, we will now close our remarks and await your reply.                    Very respectfully,

DOCKERY & HILBERT.

The firm really enjoyed a high reputation, it had the confidence of the community, and, so far as this record shows, its business transactions, until the occurrence of this transaction, were of a character to inspire confidence. For use in their loan-negotiating business they prepared a printed form of an application to be signed and sworn to by the applicant for the loan, which application became the basis of the negotiations. This form was so drawn that it showed the utmost care to disclose all the facts that a cautious lender would desire to know. In the usual course of business this application, when signed and sworn to by the applicant, would be shown to the prospective lender, and, if the loan was made, would be delivered to him with the other papers. This form of application was used in the loan which is the subject of this suit, and although it is long we deem it of sufficient significance to copy it in full:

*Application to Dockery & Hilbert, Kirksville, Mo., or Their Assigns, for a Farm Loan.*

It will be absolutely necessary to fill all the following blanks and answer each question fully or the application will be returned therefor.

1. Applicant's full name is Frank Pierce Smith.
2. Age is 35 years.

3. Wife's full name is—Single.

4. Age is—

5. P. O. address, Kirksville, in Adair county, Missouri.

6. Amount of loan wanted is twelve thousand dollars ($12,000) for a term of five years, with interest at the rate of five and one-half per cent per annum, to be paid annually; notes and mortgage to be drawn upon your customary form of blanks. The security offered is described as follows (show position on diagram). (Show any exceptions, such as school lot, church lot, burial ground, railroad rights of way, etc.).

7. The west three-fourths (¾) of section twenty-seven, and the northeast quarter (¼) of section twenty-eight (28) (excepting one hundred feet off of the entire west side of the last mentioned quarter section, which is reserved for railroad right of way). All in township sixty-four (64) north, of range sixteen (16) west of the 5th Principal Meridian—aggregating six hundred and forty (640) acres, more or less.

8. Containing in all 640 acres, situated in the township of Nineveh, county of Adair, Missouri.

9. Located two and one-half miles from Nineveh the nearest station on the I. & St. L. Railroad:

Division of crops for last year and yield. Five miles to Novinger, on the O., K. C. & E. Railway and five miles to Greentop on Wabash Railway. Two miles to Fegley, inland town. Two and one-half miles to Shibley's Point, inland town. (These must equal total number acres described.)

One hundred and sixty acres in corn, 50 bushels. —— acres in oats, —— bushels. ——acres in wheat, —— bushels. Forty acres in meadow, 1¼ tons. Thirty acres in other crops. Forty-one hundredths acres in orchard. Four hundred and ten acres in pasture. —— acres in ——. Eighty acres in timbered pasture. —— acres in grove. Six hundred and forty acres total.

10. How many acres are under cultivation? Five hundred and forty.

11. How many acres were originally prairie? Four hundred and fifty to five hundred.

12. What is the general character and quality of the soil?

13. How many acres are fenced? Six hundred and forty.

14. Kind and description of fence? Wire.

15. How many acres are wet or otherwise unfit for the plow? None.

16. Is the land watered? Yes:

17. How? Wells.

18. Is the land rolling or flat? Almost level.

19. Does it need ditching? No.

20. How many rods of open ditch upon the land?

21. How many rods of tile? None.

22. How many acres subject to overflow? None.

23.  Is the land rented?  No.

24.  To whom?

25.  Until what date?

26.  At what rental?

27.  What is the usual annual rental value, per acre, of similar property in the vicinity?  Three dollars to three dollars and fifty cents per acre.

28.  What encumbrance now on the land?  None.

29.  What is the last assessed value on above property for taxation?  Six thousand four hundred dollars.

30.  Is the above land on a public road?  Yes.

31.  When did you purchase the land?  October, 1901.

32.  What did you pay for each tract?  $25,600.  (If purchased in parcels, state details.)

33.  What were the terms of purchase?  Cash.

34.  State in detail what improvements you have made thereon since you bought it, and are any buildings begun and not finished?  None.

35.  What is the money value of such improvements?  $————.

36.  What buildings are on above land?  One and one-half story frame dwelling, small barn, cribs, granary, etc.  (Give size, material when built, and what used for.)

37.  On which forty acre tract are they located?  N. E. N. E. (28).

38.  For what amount insured?  Seven hundred dollars.

39.  In what company?  Old line of ————

40.  When does policy expire?  1904.

(Note:  Fire insurance policies, subject to mortgage and subrogation agreement, without co-insurance clause, and in companies satisfactory to the lender, will be taken out for the benefit of the loan, if required.)

41.  I own other land of the value of $3500 encumbered for $————.

42.  I own —— head of horses and mules, —— head of cattle, —— head of hogs, and —— head of sheep.

43.  For what purpose is this money applied for to be used?  To build new house and barn, purchase stock, and improve premises.

44.  Are there any suits, attachments or proceedings pending or judgments unsatisfied against you in any court, State or United States?  No.

The applicant to have the privilege of making payments of $100, or multiples thereof, on account of principal on any interest-paying day.

45.  The present actual cash value of the lands is

640  acres, at  $40  per  acre  $25,600.00

acres, at  $——  per  acre  $

acres, at  $——  per  acre  $

College v. Dockery.

Total ......................................................$25,600.00
46. The present cash value of the buildings is ........ 950.00

47. Total value at present .........................$26,550.00
State of Missouri, County of Adair, ss.

The applicant, being duly sworn, deposes and says the statements above are true and correct in every particular, and are made for the purpose of obtaining a loan, as above applied for; that he is of lawful age; that he is in peaceable possession of the property; that his title and possession is at this time unquestioned; that he is neither principal or surety on any bond which is by law a lien on said premises; that there are no mortgages or other liens unsatisfied upon said premises, or suits pending against him in any court of record of this State, or of the United States, which can result in a lien thereon that will not be removed before the loan is completed; that there is no liability of any lien being filed by mechanics, or others, which can take precedence of the lien of the loan above applied for; that there are no unrecorded deeds or mortgages except such as are shown by the abstract submitted; he understands that the loan hereby applied for is to be made upon the representations as to said premises above described, and the title to the same, made by him in this application.

FRANK PIERCE SMITH, Applicants.

Subscribed aand sworn to before me this 21st day of November, 1901.

JAMES C. WATSON,
Notary Public.

Com. ex. Aug. 26, 1902.
(*Seal.*)

That is the application which Dockery & Hilbert under their firm name forwarded to the plaintiff and with it they forwarded also an appraisement of two freeholders resident of the county, who certified that the property was worth $26,400, and also the report of a local agent selected by the firm who certified that the applicant, Frank Pierce Smith, was a man of good character and credit, that the cash value of the land was "$25,000 or more," and the value of the buildings $700. In addition to those documents, Dockery & Hilbert inclosed to the plaintiff a certificate of title bearing the caption of "Thos. J. Dockery, Pres.; Edwin L. Hilbert, Secy. Certificate and guarantee of title by the Dockery & Hilbert Abstracting Company," and certifying that they had examined the records of

Adair county and found the title to the real estate
described in the application "to be good, in Frank
Pierce Smith, that there were no mortgages, trust
deeds, judgments, taxes or liens of any nature what-
ever except a deed of trust in the sum of twelve thou-
sand dollars to Dockery & Hilbert now assigned to
Monmouth College . . . and recorded in Trust
Deed Book 40 of the records of said Adair county. We
further certify that said deed of trust is the first lien
on the above described real estate." At the foot of
the certificate, after the signature, is this: "(Have
the only complete set of abstracts to all lands in Adair
county)."

These documents were inclosed to the plaintiff in
a letter from the firm in which the property is de-
scribed as "one of the finest farms that can be found
in north Missouri," and also the statement that lands
in that county are asssessed "at about one-fourth
the value or less." The letter concluded with the
statement: "You would not find a more desirable
security on which to place your money. Awaiting your
reply, we will remain, very respectfully, Dockery &
Hilbert."

All the statements made in the application and
certificates of appraisement and valuation were true
with two important exceptions; that is, the statement
that the title to the property was well vested in Frank
Pierce Smith and that he was a man of good character;
the truth being that Frank Pierce Smith never owned
any interest in the property, but was a totally impe-
cunious and financially irresponsible man; the prop-
erty belonged in fee to Hilbert, the defendant's part-
ner.

On the showing thus made the plaintiff agreed to
make the loan. Thereupon Dockery & Hilbert drew
their draft on the plaintiff, payable to the Baird Nat-
ional Bank, for $12,000, and accompanied the draft
with the promissory notes of Frank Pierce Smith, one

for $12,000 for the principal, and five for $660, each for interest; the plaintiff paid the draft, and the money was placed by the bank on its books to the credit of Dockery & Hilbert, and was drawn out in the course of business on checks of Dockery & Hilbert.

Defendant Dockery, as a witness in his own behalf, testified that he did not know that the firm of Dockery & Hilbert kept an account with the Baird National Bank. Yet that account, or so much of it as was shown in evidence, began in February, 1901, and continued until August, 1904, and during that period the deposits to the credit of Dockery & Hilbert amounted to $140,493.80. The firm also had an account with the National Bank of Kirksville running from February, 1901, to July, 1904, the amount of deposits of which is not shown, but the account showed checks drawn against it by the firm in the handwriting of Hilbert to the amount of $18,168.36. Defendant Dockery testified that he did not know that such an account was kept in that bank; he only learned the fact the day before he testified. It was also in evidence that the firm had a small bank account with the Kirksville Savings Bank; the deposits from September, 1898, to March, 1903, amounted to about $26,000. Dockery testified that he did know something about that account, and the evidence was that he drew one of the checks against it, which was the last check, to withdraw the balance in April, 1905; all the rest of the checks against that account were drawn by Hilbert in the name of the firm. Mr. Dockery also testified that they kept no partnership books of account, in which loan transactions were entered; that when a transaction was closed he and his partner then and there divided the commission earned, and there it ended.

The $12,000 note in question was payable to Dockery & Hilbert, and indorsed by them without recourse; it recited on its face: "This note is given for an actual loan of the above amount, and is secured by a deed

of trust of even date herewith, which is a first lien upon the property described therein.'' These notes were payable at the office of Dockery & Hilbert pursuant to an agreement between them and the plaintiff made during their previous transactions at the request of Dockery & Hilbert, the plaintiff acceding to the request on condition that the moneys be remitted to plaintiff without cost.

The plaintiff loaned the money on the faith of the sworn application, the certificates as to values, the certificate of title and the letters of the firm. There was no deed of trust forwarded with the papers.

The first three interest notes were paid; the money being remitted to plaintiff by Dockery & Hilbert. When the fourth interest note came due it was not paid at maturity, but $560 was paid thereon by Hilbert in December, 1905, the firm of Dockery & Hilbert being then dissolved. The failure to pay that note started investigation which led to the discovery of the fraud, and, according to the testimony of defendant Dockery, it was the first of his knowledge that this $12,000 loan had been made.

In this transaction all the signatures of the firm were written by Hilbert. It was in evidence that in the prosecution of the loan business Mr. Hilbert, almost without exception, did the clerical work, preparing the papers, etc., and he did the principal part of the letter correspondence. Defendant Dockery himself testified that Hilbert did most of the correspondence with Monmouth College. In January or February, 1901, which was nearly a year before the transaction in question, the plaintiff then having some loans outstanding which it had made through this firm, sent a representative to Kirksville to investigate the standing of the firm and look over the securities on which its loans had been placed. He first went to all the banks in town, made inquiries of them about the standing of Dockery & Hilbert and made like inquiries of men in other kinds

of business and having satisfied himself on that point, inquired of a gentleman whom he met on the street the way to the office of Dockery & Hilbert; that gentleman said: "There comes Mr. Hilbert," whereupon the Monmouth College man spoke to Mr. Hilbert, and those two went to the office of the firm and there the Monmouth College man was introduced to Mr. Dockery by Mr. Hilbert as "Mr. Buchannon of Monmouth, where we have some loans made." But Mr. Dockery was in conversation with some other men at the time, and said to this representative of the Monmouth College: "Mr. Hilbert is looking after that part of the business largely. I have other things to look after." Then the Monmouth man and Mr. Hilbert went out together and drove over some farms on which the loans had been placed.

It was admitted that Hilbert made a voluntary assignment for the benefit of creditors in October, 1904; that claims aggregating about $100,000 were proven up against his estate; which paid about twenty cents on the dollar. He left the State in November, 1907, and has not since been heard of. The land mentioned in the Frank Pierce Smith application and other lands of Hilbert were sold by the assignee, and defendant Dockery and Mr. Pickler were the purchasers.

The suit in the beginning was against both members of the firm, but no service being had on Hilbert and he having left the State it was dismissed as to him. Defendant Dockery filed an answer in which he admitted his partnership with Hilbert, and admitted the transaction by which the plaintiff was defrauded of the $12,000, and averred that it was the result of a fraudulent conspiracy between Hilbert and Frank Pierce Smith, and that defendant Dockery knew nothing about it. The answer also averred that for some years prior and subsequent to November, 1901, the firm of Dockery & Hilbert "did negotiate and sell

notes secured by deeds of trust to plaintiff upon certain definite rules and conditions made between defendants and plaintiffs, by its treasurer, its agent in that behalf, before any such notes were sold to plaintiff, to-wit: that in all cases before any note should be sold by them to plaintiff, an abstract of the conveyances of record affecting the title to real estate conveyed to secure the payment of such note or notes should be furnished to plaintiff, showing title in fee to said real estate in the maker of such note or notes," and that the notes were secured by deed of trust duly recorded and the title approved by the plaintiff or its attorneys. And the answer alleges: "That plaintiff's said treasurer and defendants were copartners in said transactions and shared the commissions on all notes sold by defendants to plaintiff under the terms of said agreement."

Then the answer goes on to say that Hilbert and Smith without the knowledge of defendant Dockery "entered into a conspiracy for the express purpose of cheating and defrauding the plaintiff and this defendant out of the sum of $12,000; in pursuance of which conspiracy" they executed the papers above mentioned including the notes and a deed of trust, and obtained the money, but Dockery knew nothing of it until the——day of December, 1905; that it was negligence on the part of the plaintiff to have bought the notes without a full abstract of title approved by its attorneys, "contrary to and in violation of the terms and conditions" above mentioned; that if plaintiff had required such an abstract it would have shown that the certificate of title furnished by the Dockery & Hilbert Abstract Company on which plaintiff relied was false. That if plaintiff had informed defendant Dockery at any time within three years after the transaction that it had bought these notes he could have required Hilbert to pay the same and have protected himself; wherefore plaintiff is estopped to prosecute

this suit. The answer pleads also the five-year Statute of Limitations.

The reply was a general denial and a specific denial of the alleged agreement as to terms and conditions on which loans were to be made, but that if any such agreement was made it was not observed and was waived; that if the alleged agreement with its treasurer to divide commissions was made, it was without the knowledge or consent of plaintiff.

The evidence bearing on the affirmative defences pleaded in the answer will be stated later when we come to consider them. The trial was by the court, jury waived. The court found for the defendant on the issue relating to the alleged agreement as to the manner of conducting the business and that the plaintiff was guilty of negligence in paying the draft of Dockery & Hilbert for $12,000 under the circumstances, and "that the negotiation of said notes under the circumstances and without an abstract of title and the opinion of attorneys thereon, was without the scope of the authority of said Hilbert, and so known to the plaintiff and its said treasurer at the time;" that if plaintiff had used ordinary diligence it could have discovered the fraud within a month, and the money could have been collected off of Hilbert. The court also found for the defendant on the plea of the Statute of Limitations. From that judgment the plaintiff appealed.

I. Aside from the affirmative defenses set up in the answer, the plaintiff's prima facie case is so clear that discussion would seem almost out of place. But when one comes into court denying his liability growing out of a transaction conducted by his partner in trade in the name of his firm and in relation to a matter within the scope of the business of the partnership, it may be well to refer to the fundamental principle of law on which every partnership is builded and

without which no partnership business could be conducted, and also without which no one would dare deal with a member of the firm in the absence of the other partner or partners. Every one perhaps feels a sympathy for a man who is called into court to answer for the wrongdoing of his partner, who has abused his trust and used the firm name to commit a fraud for his own benefit, but that sympathy cannot alter the law. The authorities cited in the brief of the learned counsel for the appellant are so appropriate that we will quote from some of them.

Mr. Justice Story, in his work on partnership, after laying down the doctrine of the general authority of each partner to bind the firm in all transactions within the scope of the partnership business, says that it has its foundation not only in common convenience and public policy but is almost a matter of moral necessity; he says it gives to all and each of the partners the entire administration of all the partnership business. [Story on Part. (7 Ed.), sec. 103.] And continuing the subject he says (Sec. 107): "Thus the representation of any fact, or a misrepresentation of any fact, made in any partnership transaction, by one partner, will bind the firm." Then in section 108 the law writer says: "The principle extends further, so as to bind the firm for the frauds committed by one partner in the course of the transactions and business of the partnership, even when the other partners had not the slightest connection with, or knowledge of, or participation in the fraud; for, as has been justly observed, by forming the connection of partnership, the partners declare themselves to the world satisfied with the good faith and integrity of each other, and impliedly undertake to be responsible for what they shall respectively do within the scope of the partnership concerns. Hence, if, in the business of the partnership, money is received partly by one of the firm and partly by another, to be laid out upon a

mortgage, and a mortgage is forged by one partner without the knowledge of the other, the innocent partner will be liable for the whole money. So, if representations of certain facts, as existing, are fraudulently made by one partner, unknown to the others, in the partnership business, and the facts never existed, but the whole statement is mere fiction, the firm will be bound to the same extent as if it were true, and the facts existed. This whole doctrine proceeds upon the intelligible ground that, where one of two innocent persons must suffer by the act of a third person, he shall suffer who has been the cause or occasion of the confidence and credit reposed in such third person.''

The Supreme Court of Illinois has expressed the law thus: ''No legitimate partnership contemplates, as a part of its business, the commission of frauds or of acts prohibited by law; yet, when a partner in the course of the partnership business commits a fraud or does acts prohibited by law, the firm is liable, although the other partners have no knowledge of such frauds or illegal acts.'' [Tenney v. Foote, 95 Ill. 99, l. c. 108.] In a later case the same court said: ''It is a matter of no consequence whether a partner is acting fairly with his copartners in a particular transaction or not; if the act is within the apparent scope of his authority, and professedly for the firm, his acts and representations are binding upon the firm in favor of the indebtedness of a third party . . . Parties dealing with a partner in good faith, without any notice, must have their rights determined in the same manner and be governed by the same rules as if they were in fact dealing with the full knowledge and consent of all the members of the firm.'' [Trust & Savings Bank v. Kinnare, 174 Ill. 358, l. c. 362-3.]

In this case not only did Mr. Dockery by entering into partnership with Mr. Hilbert impliedly say to all the world that his partner was a man of good faith

and integrity and worthy of all confidence, but when Mr. Buchannon, representing the Monmouth College, came to Kirksville to investigate the standing of the firm and to look over the farms on which the former loans had been made, sought to converse with Mr. Dockery as the head of the firm, the latter turned him over to his partner, saying "Mr. Hilbert is looking after that part of the business largely; I have other things to look after." Is it strange then that the representative of the college should thereafter place confidence in Mr. Dockery's partner and treat with him as the firm? Nearly if not quite all the papers that were written in course of their other business with the college, and the letters in relation to them, were written by Mr. Dockery's partner, and Mr. Dockery knew that fact. Not only did the college have the high reputation of the firm to rely on, but also its past transactions with the firm conducted in an entirely satisfactory manner by Mr. Hilbert, and the affirmative statement of Mr. Dockery to Mr. Buchannon that that business was entrusted especially to Mr. Hilbert because he (Mr. Dockery) had other matters to look after. On that assumption the plaintiff's business relations with the firm continued nearly two years before the transaction now complained of, and this was the first fraud committed. Therefore unless the plaintiff is precluded by the affirmative defense pleaded, it is entitled to recover.

II. Now let us consider the affirmative defense set up in the answer, to-wit, the alleged agreement as to the manner of conducting the business, and the plaintiff's alleged negligence in failing to require a complete abstract of title and opinion of a lawyer thereon. In the answer it is alleged that for some years prior and subsequent to November, 1901 (the date of this fraudulent transaction), the firm did negotiate and sell to plaintiff notes secured by deeds of trust

"upon certain definite rules and conditions, made between defendants and the plaintiff by its treasurer, its agent in that behalf, before any such notes were sold to plaintiff, to-wit, that in all cases before any note should be sold by them to plaintiff an abstract of all conveyances of record affecting the title to the real estate" should be furnished the plaintiff showing that the deed of trust securing the notes was recorded and the title approved by plaintiff or its attorneys.

Taking the alleged agreement as it is stated in the answer the question arises. For whose benefit was it made, whose interests was it to protect, why should care be taken to see that the security on which the plaintiff was lending its money was good and that there was no false representation as to title? Was it because one partner distrusted the other and demanded this security? Did Mr. Dockery then have any suspicion of the integrity of his partner? Will he now say that he made that contract to protect himself from any fraud that his partner might commit? If he would so say he would put himself in a worse attitude than the evidence in this case now puts him. He would put himself in the attitude of one who being suspicious of the integrity of his partner yet held him out to the world as a man worthy of all trust. He will not say that. Then for whose protection was the alleged agreement made? Unquestionably it was for the protection of the party who was lending the money. If then that party having a right to demand a complete abstract with the lawyer's indorsement of it did not, in this instance, insist on the strict letter of the supposed contract, but trusted to the honor of the firm and accepted in lieu of a complete abstract a certificate of title made by the Dockery & Hilbert Abstract Company, can the firm complain, or can any member of the firm complain? Can the firm or any member thereof be heard to say to the plaintiff: "You trusted us too

far; you should not have placed confidence in our in-
tegrity; when we sent you the application supported
by the sworn statement of the applicant (whom we
certified to be a man of good character), which state-
ment one member of our firm knew to be false but the
other did not, and sent you a certificate of good title
from our abstract office in the handwriting of a mem-
ber of our firm, and when we wrote you that this was
an especially choice loan, in a letter bearing the signa-
ture of the firm in the handwriting of the partner who
had conducted all our correspondence with you there-
tofore and thereafter and to whom, as the member of
our firm especially intrusted with your business, we
referred your Mr. Buchannon when he came to visit
us in our home town and in our office, still when we
did all this you should not have trusted us, you should
for the protection of the other member of our firm,
have demanded a complete abstract indorsed by a rep-
utable lawyer.'' If the court would sanction that de-
fense it would introduce a very great discord in the
system of laws on the subject of partnerships.

In this connection we note also that the answer
says: ''That plaintiff's said treasurer and defend-
ants were copartners in said transactions and shared
the commissions on all notes sold by defendants to
plaintiff under the terms of said agreement.'' We
are at a loss to understand just what the defendant
means by that. It is pleaded in connection with and
as a part of this alleged agreement. The answer does
not say that that agreement was made with the plain-
tiff or with the knowledge of the plaintiff, but with
the plaintiff's treasurer whom they took into copart-
nership and with whom they divided the commissions
on loans made by the college. Surely the defendant
does not mean to say that he was a party to a con-
tract to corrupt by bribery the plaintiff's agent; he
would not do such a thing as that, therefore we may
put that out of view. Assuming then that it was an

honest agreement the only other significance it has is that the firm agreed to do the business of the plaintiff for half commissions; a totally immaterial fact and therefore mere surplusage in the answer.

Before turning to defendant's testimony offered in support of the alleged "definite rules and conditions" agreed on, let us see how the question of negligence stands. Defendant has not intimated a charge of bad faith on the part of the plaintiff, he has not said or implied that the plaintiff conspired with defendant's partner to put out its $12,000 on worthless security for the benefit of Hilbert and the injury of Dockery, but he says that plaintiff has been negligent in trusting too implicitly on the integrity and good faith of defendant's partner. Is defendant Dockery in a position to talk about anybody's negligence in the conduct of this business? He says he knew nothing about it until the failure to pay the fourth installment of interest brought exposure of the fraud. Why did he not know it? If his knowledge was of any consequence as affecting his liability, he cannot excuse his want of knowledge except he take refuge in implicit confidence in his partner, and to take that refuge is to confess his own negligence. By his own testimony the little attention that he paid to the business of the firm convicts him of negligence. For years before and years after this transaction he suffered his partner to deal with this plaintiff and others in the business of negotiating loans and gave them little or no attention. The firm had bank accounts in three of the banks in the town where he lived, yet two of those accounts he did not know existed, and the third one he only knew at its close and drew the one check to close it. The account in the Baird National Bank ran from February, 1901, to August, 1904, and embraced deposits of over $140,000, including the $12,000 in question, yet he knew nothing of it; he trusted it all to his partner. Mr. Baird, the president of the bank, testified that

he had known the defendant for over forty years. Here then we have a prominent business man in a small city, well acquainted with the president of one of the principal banks, and not knowing that his firm had a large account there. Yet into that very account has passed the plaintiff's $12,000 to the credit of the defendant's firm, was there mingled with other deposits and drawn out on checks of the firm. Whatever may be said of Mr. Hilbert's other acts in relation to this loan it cannot be said that he acted in a secret manner with this $12,000, after it was collected, to conceal it from his partner. He deposited it to the credit of the firm in one of the most prominent banks in the city and there it remained, as well as we can judge by the size of the checks drawn after the date of the deposit, for several months; at least there is no check whose size indicates that it was aimed especially against that deposit, but it went out in a number of small checks. We gather from the evidence that into that bank account went the insurance business that was conducted in the office of the firm and in the name of the firm with the knowledge and consent of defendant, but in which neither he nor the firm had any interest. In suffering that business to be so conducted the defendant manifested great confidence in his partner, who made the deposits and drew the checks against it, but it was allowing the firm name to be used for a purpose outside of the partnership business, and if the privilege had been misused or abused or if loss had resulted from mismanagement the firm would have been liable. Yet the defendant, knowing that this insurance business was being so conducted, knowing that considerable money would change hands in the course of that business and knowing that a bank account would naturally be required, paid no attention to it, but trusted all to his partner. We are not criticising the defendant for his amiable indulgence in this matter, but refer to it only in con-

nection with his complaint that he has suffered by the
negligent manner in which the Monmouth College, an
educational institution in another State, conducted its
business intrusted to his care in Kirksville.    Men
have a right, so far as concerns themselves, to conduct
their business as loosely as they please, but when they
conduct it loosely and in consequence thereof a third
party is injured, they are not in a favorable position
to complain that the injury would not have resulted
if the injured party had been more careful than they
themselves were.

Now let us turn to the testimony of the defendant
and see what evidence he offers to sustain the allega-
tion in his answer that there were "certain definite
rules and conditions" agreed to between himself and
the plaintiff's treasurer.    After referring to former
loans that the firm had made for the college, he was
asked by his counsel: "Q.  Now, just tell the court,
if you please, what arrangements you had with the
college about negotiating these loans?   A.   Well the
arrangement with the college was the ordinary way
of making loans.  We were first to submit the applica-
tion and after the loan was accepted we were to for-
ward a note and deed of trust with the abstracts.  Of
course the note was usually ——."  At this point plain-
tiff's counsel said they thought they were entitled to
know with whom the arrangement was made.  After
some talk it was said that the arrangement was made
with Mr. Wilson, the former treasurer, who was dead,
and also with Mr. Woods, the present treasurer, and
the court ruled that the witness might tell what his
agreement with Mr. Woods was, but could not repeat
any talk he had with the dead man.  Defendant was
then asked by his attorney:  "Q.  At the very start
state whether or not all of these abstracts of title were
furnished?  A.  In every case?  Q.  Before the notes
were cashed?  A.  Yes, sir."  And in answer to fur-
ther question he said the abstracts were examined by

Ellison and Campbell. Then this question and answer next appear: "Q. Now, did you have any talk with Mr. Woods about the plan of making a loan? A. Yes, sir; I told him that the plan we had formerly would be pursued if it was satisfactory and Judge Ellison and Campbell to examine the abstracts." The above extract contains every word we can find in the record offered to prove the alleged agreement of "certain definite rules and conditions made with the treasurer." The treasurer, as a witness for plaintiff, denied that he had such a conversation with Mr. Dockery or either member of the firm. There was other evidence tending to show that in former and subsequent transactions abstracts approved by the attorneys above mentioned usually, though not always, were received with the notes before the drafts of Dockery & Hilbert were paid, and in cases where the drafts were paid without the abstracts and deeds, on the attention of Dockery & Hilbert being called to the fact, the documents were supplied, but there was no case where the plaintiff refused to pay the draft of Dockery & Hilbert because the abstract and deed were not present. It may, therefore, be said that the evidence tends to support the contention of defendant that such was the custom, but there is no evidence that there was an agreement that the plaintiff would not pay a draft of Dockery & Hilbert until all these documents were present. Mr. Dockery did not so testify; when his own counsel pressed him on the point the extent to which he would go was: "Well, the arrangement with the college was the ordinary way of making loans." Then he went on to say what the ordinary way was, and when asked to state what talk he had with Mr. Woods he said: "Yes, I told him that the plan we had formerly would be pursued if it was satisfactory and Judge Ellison and Campbell to examine the title." In his answer to the first question he indicated only the ordinary way in which his firm con-

ducted its business, that is, he said he arranged with the college to conduct its business in the ordinary way, then when pressed to say what he said to Mr. Woods he said I told him that the plan we had formerly would be pursued if satisfactory. How in the world it could be presumed that Mr. Woods would understand that as being an admonition to him not to trust Mr. Dockery's partner, and a binding obligation on his part never to pay a draft drawn on him by the firm until he had taken every precaution to guard against the possibility of one partner defrauding another, the writer of this opinion is unable to see.

We hold that there was no substantial evidence to support the alleged agreement of "certain definite rules and conditions" on which the business was to be conducted.

And we also hold that even if there had been such an agreement its terms could have been waived by the party for whose protection it was made, and even if it could be construed into an agreement for the protection of the firm it could be waived by the firm and what the firm could do any member in the name of the firm could do.

III. The plea of the five year Statute of Limitations. The money was obtained from the plaintiff December 2, 1901, the fraud was discovered in December, 1905, the suit was begun May 4, 1907. Defendant insists that it is not sufficient to avoid the Statute of Limitations for the plaintiff to show that it did not discover the fraud until December, 1905, but it must also show that it used due diligence to discover it, and defendant says that the plaintiff in its pleadings and proof only shows that it did not discover the fraud until that date; therefore, the statute is not avoided.

Fraud is a very subtle subject, it is cunningly devised and artfully perpetrated; concealment is in its very essence. The law does not presume fraud,

it does not require of one that he should suspect fraud in every transaction; and, although it requires him to be reasonably watchful of his own interests and will not relieve him if he has been negligent in that respect, yet the mere fact that a transaction turns out after a length of time to have been fraudulent, does not put the victim beyond the pale of the law. If there was nothing in the transaction at the time, or nothing occurring later, to cause a reasonably prudent man to suspect fraud, he is not guilty of negligence in failing to ferret it out.

This is a suit against two men composing a business copartnership; the theory of the plaintiff's complaint is that they are liable under the law of partnership; one of the partners being beyond the reach of process the suit is dismissed as to him and prosecuted as to the one who is served and who defends. This defendant is not sued on account of any act of his own, but on account of the act of his firm; having personally done no wrong, if he is not liable under the law of partnership, he is not liable at all; and if he is liable for the act of his partner, done in the name of the firm and within the scope of the partnership business, the fact that he has done no wrong himself is immaterial. If he is not liable because he was Hilbert's partner he is not liable at all, and if he is liable because he was Hilbert's partner he is as much liable as Hilbert would be if he were here defending, and he can make no defense that Hilbert could not make. If Mr. Dockery can be heard to say that the plaintiff should not recover because it was negligent in not discovering the fraud sooner, Mr. Hilbert could avoid liability on the same plea. Each might have couched his plea in different words, but each plea would have been of the same legal effect; Mr. Hilbert might have said to the plaintiff, "You ought not to have trusted me, you should have suspected that I was a thief and you should have come from Illinois and instituted an in-

vestigation;" while Mr. Dockery could only have said, "You ought not to have trusted the man whom I held out to you and to the world as a man worthy of all confidence, you should have put a detective on his path and in that way enabled me to recoup against my partner for my liability to you." That in effect is what this defendant now pleads, but not in such plain words.

Defendant insists that the plaintiff's pleading does not state facts sufficient to avoid the plea of the Statute of Limitations, because, he says, it only states that the plaintiff did not discover the fraud until December, 1905, but does not show that it used any diligence to discover it before that time; and appellant in its brief says it concedes that the petition is defective in that respect according to our decisions, but that no objection of that kind was made in the trial court, and the cause was tried on the theory that the pleading was sufficient. It is not always necessary for a plaintiff to aver in his pleading that he used diligence to discover the fraud, because if he had no reason to suspect fraud he was not called upon to investigate; the fraud may have been so concealed as not to arouse suspicion, in which event it would be sufficient to say that the defendant so concealed the fraud or so acted in relation to it as to allay apprehension. And the circumstances under which the fraud is perpetrated may be such that in its very concoction concealment is shown and suspicion averted, and so it was in this case, as the statements in the petition show. The petition states facts showing the plaintiff, an educational institution in another State, coming to Missouri to invest its capital, confiding its business to the firm of Dockery & Hilbert who the petition says "enjoyed not only in the said city of Kirksville, but in the adjoining States a reputation for probity and high financial standing, so that the representations and state-

ments of said partnership firm, and each of the members thereof, were readily accepted and acted upon as being true,'' etc.   Then follow statements showing how, by a cunningly devised scheme of fraud and false swearing, a member of that high standing firm, acting in the name of that firm, obtained the plaintiff's money and plaintiff thus trusting did not discover the fraud for four years.   The circumstances stated show by natural inference that the fraud rested alone in the breast of the guilty member of the firm and was so hidden that no suspicion was aroused, therefore it is not correct to say that the plaintiff's pleading to avoid the Statute of Limitations states only the mere fact that the fraud was not discovered until December, 1905.   But in an action based on fraud and deceit, against which the Statute of Limitations is interposed, if the plaintiff merely states that he did not discover the fraud until a certain date, and the defendant, without questioning the sufficiency of the pleading, goes to trial on that issue, and evidence is heard tending to show that it was the conduct of the defendant that allayed suspicion, he cannot, on appeal, complain of the defect in the pleading.   If at any time the sufficiency of the pleading in this particular had been questioned in the circuit court and adjudged defective, the plaintiff could have amended.   It is only when a pleading fails to state a cause of action or a defense, or fails to show jurisdiction in the court, that the defect can be complained of for the first time in the appellate court.   There was no demurrer filed in this case, and no objection to the evidence on the specific ground of this alleged defect; the only objection to the plaintiff's petition in the circuit court was when the trial began defendant objected to any evidence because, he said, the petition did not state facts constituting a cause of action; there was no hint of any special defect.   And when the trial came on and plaintiff offered evidence

tending to show that the payments of interest for the first three years were promptly remitted in the firm name of Dockery & Hilbert there was no objection on the specific ground that it was not so pleaded. When a party withholds his objection to his adversary's pleading at a period in the progress of the case when, if the objection is held to be good, the other party may amend, he should not be heard to make it when that period is passed, unless it is a vital point. Objection to a petition which comes after answer filed and just as the trial is about to begin, and which comes then only in the form of an objection to the introduction of any evidence, is not entitled to as favorable consideration as a general demurrer timely interposed. In such case if by reasonable inference from the facts stated a cause of action can be constructed it will be the duty of the court to do so. [Young v. Shickle H. & H. Iron Co., 103 Mo. 324, l. c. 327; McDermott v. Claas, 104 Mo. 14, l. c. 21; Cobb v. Lindell Ry. Co., 149 Mo. 135, l. c. 143.]

A party may, if he choose, anticipate a plea of the Statute of Limitations and state facts in his petition to avoid it, but the usual course of pleading is to wait until the answer is filed pleading the statute and then avoid it by a reply, but in such case if he should fail to file any reply at all to the plea of the Statute of Limitations and the cause goes on to trial, proof is introduced avoiding the statute, and the issue is tried as if a sufficient reply was on file, the losing party cannot raise the objection in the appellate court that the issue was not properly presented in the pleadings. [Henslee v. Cannefax, 49 Mo. 295; Meader v. Malcolm, 78 Mo. 550; Heath v. Goslin, 80 Mo. 310; Thompson v. Wooldridge, 102 Mo. 505; State ex rel. v. Phillips, 137 Mo. 259; Ferguson v. Davidson, 147 Mo. 664; Hall v. St. Joseph Water Co., 48 Mo. App. 365.]

The decisions of this court referred to by defendant to sustain his position that the plaintiff cannot recover because it has not shown due diligence in discovering the fraud are not like this case. Shelby County v. Bragg, 135 Mo. 291, was an action against the county clerk for fees received in excess of his salary. There was no question of pleading in that case, the petition sufficiently stated the facts relied on to avoid the Statute of Limitations, to-wit, that the clerk by his false statements and settlements concealed from the county court the true amount of the fees collected by him, and that was the proof on which plaintiff relied. But the court held that the statute made it the duty of the county court to examine each statement, that the records which it was the duty of the county court to examine would have shown that the statements were false and the county court was negligent in taking the false statements without examination. In that case the court said: "But it is well settled in this State, whether by force of the statute or independent of it, that a fraudulent concealment of a cause of action will delay the operation of the Statute of Limitation until after discovery of the fraud."

In Loomis v. Railroad, 165 Mo. 469, the plaintiff had stated in the petition not only his ignorance of the fraud but also that the defendants kept him in ignorance and acted "so seceretly as not to put him on notice thereof." It was not, therefore, for any defect of pleading that the court held that he was barred by the Statute of Limitations, but because the evidence showed that as early as 1881 the plaintiff knew that the Atoka Company was working the mine and receiving his share of the proceeds, and to say now that he only discovered the fraud in 1890 would be to say that he willfully shut his eyes to the facts for ten years.

Callan v. Callan, 175 Mo. 346, was a suit for damages for the alleged fraudulent procurement from plaintiff by her brother of a deed conveying to him her interests in her father's estate and also land which her mother had given her; the petition alleged that the only consideration for the deed was a conveyance to her of sixty acres of land which her brother represented was worth $6000, but which she afterwards found was worth only $600; that she was inexperienced and trusted to what her brother told her as to the value of the sixty acres; also that she thought she was conveying to him only her interest in her father's estate, but afterwards discovered that the deed included also the land obtained from her mother. To avoid the Statute of Limitations the petition stated that the plaintiff was inexperienced, not on an equal footing with her brother in whose statements and the statements of the priest she confided, that she knew nothing about the value of the land and an examination by her would have been fruitless. In that case there was nothing to excuse the plaintiff for not knowing the contents of the deed she was signing, and nothing to prevent her from examining the sixty acres of land conveyed to her and forming her own opinion as to its value, and no act alleged to have been done by defendant to lull the plaintiff into non-action or to prevent her from discovering the fraud, and so the court said that the facts stated by her were not sufficient to avoid the statute.

Stark v. Zehnder, 204 Mo. 442, to which we are also referred, was a suit in equity to reform a deed by correcting a mistake in the description of the land; it was a case of alleged mutual mistake, not of fraud.

State ex rel. v. Yates, 231 Mo. 276, was a suit against the sureties on the bond of the treasurer of State Hospital No. 1. It was in some respects quite like Shelby County v. Bragg, above mentioned, and was decided on the theory that under the statute it was

the duty of the board of managers to examine the accounts of the treasurer and that the records in their office which it was their duty to examine would have shown that the treasurer was in default. There is a wide difference between a surety on a bond and a member of a business partnership. The surety, in the case last mentioned, might well say to the plaintiff, "You should not have trusted the principal, the law made it your duty to examine his accounts in comparison with your own records, but you neglected to do so." But can this defendant say that the plaintiff should not have trusted his partner or should not have trusted documents and letters bearing the commendation and indorsement of his firm? When letters and documents bearing the signature of Dockery & Hilbert were received through the mail by the plaintiff, the plaintiff did not know, and was not charged with the duty of knowing, whether the hand-writing was that of Dockery or of Hilbert, and the legal consequence so far as the plaintiff was concerned was the same whether the hand of the one or of the other wrote the firm name.

In Vigus v. O'Bannon, 118 Ill. 334, the defendant's intestate, Richard W. O'Bannon, had received from plaintiff for collection a life insurance policy then due for the sum of $5000, on which he collected the full amount, but informed the plaintiff that he had collected only $2000, which sum he paid to the plaintiff and told him he had compromised the claim for that sum. After O'Bannon's death plaintiff presented his claim for $3000 against the estate, alleging that the collection of the $3000 was fraudulently concealed from claimant during the lifetime of O'Bannon. The Illinois court held that the mere silence of the agent under such circumstances was concealment of the cause of action, and said that if the agent goes farther and makes affirmative statements and resorts to active measures to quiet his principal's suspicions, it is

fraudulent concealment that will take the case out of the Statute of Limitations. In that case the plaintiff could have gone to Chicago where the life insurance company had its office and made inquiry, or he might have written a letter to the company and inquired, but he did neither, he simply trusted to what his agent told him. The court said (we quote from the syllabus): "The failure to use ordinary diligence to discover the fraud may be excused where there exists some relation of trust and confidence, as principal and agent, client and attorney, *cestui que trust* and trustee between the party committing the fraud and the party who is affected by it, rendering it the duty of the former to disclose to the latter the true state of the transaction, and when it appears that it was through confidence in the party who committed the fraud that the other was prevented from discovering it." That is the law of righteousness and justice; it is the law in Missouri, as well as in Illinois.

In Fisher v. Tuller, 122 Ind. 31, plaintiff and defendant's ancestors had been partners; they had a claim against the United States Government, which was instrusted to Tuller to collect; he collected it in 1867, and reported to his partner that the claim had been rejected and could not be collected; he died in 1873, his estate was fully administered and settled in 1879; the plaintiff did not discover the fraud until 1884. The Indiana court, l. c. p. 35, said: "It is true that mere silence is not a concealment within the meaning of the statute. [Citing cases.] But here there was a positive representation made by a party whose position required of him the utmost good faith, and that representation was a concealment of the cause of action. Whatever may be the rule where no relation of trust and confidence exists, we are clear that where the relation does exist, as in this case, the bar of the statute cannot avail the party who misleads his partner by representing that a claim cannot be collected

when he has, in fact, collected it and appropriated the avails to his own use.''

In the case at bar the firm of Dockery & Hilbert had not merely been entrusted with this one sum of money to invest, but in a course of dealings running through two or three years the plaintiff had come to trust them with absolute faith. Soon after the plaintiff began making loans through the agency of this firm, it sent over a representative to Kirksville to inquire of the firm's standing in the community and to view the securities; then when its confidence was entirely obtained this wrong was perpetrated, and for three years the interest was remitted in the firm name, the only purpose of which was to maintain the confidence and allay suspicion.

The notes given for the loans plaintiff made through this firm, not only those given in this transaction, but those given in all the other transactions, were by special request of Dockery & Hilbert payable at their office, they agreeing to receive and remit the money without cost. Therefore when they remitted the interest on this loan for the first three years, it was equivalent to saying this interest has been paid at our office and we remit the same to you. A more effectual method to allay suspicion and prevent investigation could not have been devised.

During all those years Mr. Dockery himself trusted his partner as a man of integrity and truth, not only trusted him himself, but held him out to the world as a man worthy of trust; there was nothing in the conduct of Mr. Hilbert during those years that aroused Mr. Dockery's suspicions, then how can he say the plaintiff should have distrusted him?

Reliance is placed on what defendant calls a finding of fact by the court that in this matter Hilbert acted outside of the scope of his authority; but that is not a finding of a fact, it is only an opinion on a point of law.

The judgment is reversed, and since all the facts are before the court there is no necessity of a new trial; therefore, the cause is remanded with directions to the circuit court to enter judgment for the plaintiff for twelve thousand dollars, with interest at six per cent per annum from May 4, 1907, until the entry of the judgment and for costs.

*Lamm, Ferriss* and *Kennish, JJ.,* concur; *Woodson, Graves* and *Brown, JJ.,* dissent, and each files a dissenting opinion.

## DISSENTING OPINION.

WOODSON, J.—I dissent from the majority opinion in this case, and will briefly state my reasons therefor.

In the first place it should be borne in mind that the respondent, Thomas J. Dockery, morally, is just as innocent of any fraud or wrong doing in this case as is the appellant itself, and probably more so, for the simple reason that he was lulled into supineness, not only on account of the splendid reputation Hilbert, his partner, bore for honesty, integrity and moral rectitude, in the community where he resided, but also on account of the implicit confidence which characterizes the fiduciary relation that exists between partners, akin—I was going to say—to that of husband and wife, but I will not sully that relation by comparing it with any other relation that exists.

Under that view of the case, the law should not be strained beyond the ordinary rule in order to hold Dockery liable for the misdeeds of Hilbert; nor upon the other hand, should it on that account be relaxed in order to relieve him from any legal obligation he owes to the college. The rights of each should be tested according to the cold letter of the law governing such cases.

241 Mo.—36

I dissent from the majority opinion for three reasons:

First: Because this was what is called and known in financial circles, as a real estate loan; and it clearly appears from even a casual reading of the record in the case that the loss resulted to the college through its own negligence in not demanding the deed of trust, which it was agreed should be furnished to it as security for the loan, notwithstanding the conceded fraud of Hilbert, for which Dockery was only legally liable.

It stands undisputed, that had the college demanded the deed of trust, at any time within a period of some three or four years after the loan was effected, which ordinary business prudence required, the fraud of Hilbert, and the innocence of Dockery, would have instantly appeared, and the college could have enforced its claim against the land upon which Hilbert had agreed in writing to give the deed of trust, which of course was an equitable mortgage; and the land was more than ample to repay the loan.

Second: Because, as previously stated, the most ordinary business prudence on the part of the college would have exposed the fraud of Hilbert, and when so exposed the law then imposed upon appellant the duty of bringing suit for the redress of its wrongs within five years from that time, which was not done in this case.

Clearly, in my opinion, the cause was barred by section 4273, Revised Statutes 1899, and was not saved by the exeception there provided for.

The subsequent payment of the interest on the loan by Hilbert was not sufficient to bring the case within section 4290 for the obvious reason that it was plainly the duty of the appellant to have demanded the security for the loan, the deed of trust, long before the first interest-paying day arrived; and had it performed that duty, fraud would have been exposed to the light, as clear as the noonday sun.

Third: It is an elementary rule of pleading, that . in order for a party to avail himself of an exception or saving clause, in a Statute of Limitation, he must plead the facts which bring his case within that clause, and if he fails to do so, it will be unavailing to him at the trial of the cause.

In the case at bar, counsel in open court conceded, and the record shows, that the appellant did not comply with this rule of pleading; but counsel seek to escape the effect of it by saying that the evidence tending to show said exception was introduced without objection, and therefore respondent waived the right to now invoke that rule.

If the record showed the facts to be as just suggested, then there would be much force in that position. But as I read the record, the objection was timely and properly made, and was by the court overruled, and exceptions were duly saved. Clearly that was sufficient to preserve the question for review by this court; and the mere fact that counsel for appellant offered and the court admitted other evidence of like character to that admitted over the objections of respondent, did not waive the previous objection made to the same class of testimony. In other words, it is not necessary to preserve the right to have this court to review the rulings of the trial court to repeat objections made to the introduction of testimony. One objection to the same class of evidence is as good as a dozen. This is so firmly settled in this State that it requires the citation of no authorities to support it.

## DISSENTING OPINION.

GRAVES, J.—When this case was first argued in the Division, my impression was that an affirmance should be decreed here. I yielded, however, to the masterly opinion of our brother VALLIANT and concurred in the divisional opinion. Upon the reargu-

ment of the case I am convinced that the judgment *nisi* should be affirmed, at least upon the question of the Statute of Limitations, and that my first impression was right.

This is an action at law, and were it not for the peculiar wording of our Statute of Limitations, the statute would begin to run from the consummation of the fraud and not from the discovery of the fraud. Without statutory provisions to the contrary, we have two rules for the application of the Statutes of Limitations to causes of action, (1) the rule in equity, which fixes the date of the accrual of the action at the date the fraud is discovered, and (2) the rule in law cases which fixes the date of the accrual of the action at the date the fraud is consummated. By statutes, many of the States have engrafted the rule in equity as to law cases, and in such States there is no difference. Missouri chances to be one of the States which has thus adopted the equitable rule in cases at law. The fifth clause of our five-year Statute of Limitations as to personal actions reads:

"Fifth, an action for relief on the ground of fraud, the cause of action in such case to be deemed not to have accrued until the discovery by the aggrieved party, at any time within ten years, of the facts constituting the fraud."

It will, therefore, be seen that by statute we have made the old equitable rule applicable to law cases as well as equity cases.

But to the point in this case. When by statute we adopted that rule we adopted it with the exceptions which years of judicial experience had grafted upon it. That exception is well couched in 25 Cyc. p. 1186, thus: "There is, however, a well established qualification to the equitable rule that the statute runs only from the discovery of the fraud. Knowledge by the defrauded party of facts which in the exercise of proper prudence and diligence would enable him to learn

of the fraud, is usually deemed equivalent to discovery; and therefore not only in equity but generally in those jurisdictions where the equitable rule has been made applicable to actions at law, the statute runs from the time when by the use of reasonable diligence the fraud could have been discovered. In other words 'constructive notice of the fraud may constitute a discovery.' "

This court, in the recent case of Callan v. Callan, 175 Mo. 346, after setting out and discussing the statute which we have set out above, has applied the exception so well stated in 25 Cyc. supra. In so doing we quoted from the former case of Shelby County v. Bragg, 135 Mo. l. c. 300. In the Callan case, we used this language:

"A party seeking to avoid the bar of the statute on account of fraud must aver and show that he used due diligence to detect it, and if he had the means of discovery in his power, he will be held to have known it. A party cannot avail himself of this exception to the statute when the means of discovering the truth were within his power and were not used. Concealment by mere silence is not enough. There must be some trick or contrivance intended to exclude suspicion and prevent inquiry. There must be reasonable diligence; and the means of knowledge are the same thing in effect as knowledge itself.

"If the aggrieved party knew of the fraud when it was committed, or had full possession of the means of detecting it, which is the same as knowledge, neglect to bring forward his complaint for more than six [five] years will deprive him of his remedy and ought to, upon the very principles and reasons upon which the Statute of Limitations was enacted. . . ."

After making the above quotation from the Bragg case, and Farnan v. Brooks, 9 Pick. 246, in the Callan case, supra, this court added this language:

"Indeed, the authorities are all one way upon this question. [Wood on Limitations, sec. 276; McKnee-ley v. Terry, 61 Ark. 527; Busw. Lim., sec. 385; Underhill v. Ins. Co., 67 Ala. 45; Ramsey v. Quillen, 5 Lea (Tenn.), 184; Adams v. Inhabitants of Ipswich, 116 Mass. 570; Tyler v. Angevine, 15 Blatchf. (U. S.) 536; Eiffert v. Craps, 58 Fed. 470.]

"And 'the bill or' complaint should set forth the nature of the transaction fully, and also the acts of concealment, and the time of its discovery. . . . The concealment contemplated by the statute is something more than mere silence; it must be of an affirmative character and must be alleged and proved so as to bring the case clearly within the meaning of the statute.' [Wood on Limitations (3 Ed.), sec. 276.] The same rule is announced in Ware v. Galveston, 146 U. S. 116; Felix v. Patrick, 145 U. S. 317; Hardt v. Heidweyer, 152 U. S. 559.

"While the petition alleges that the fraud complained of was not discovered by plaintiff until September, 1898, it does not allege what the discovery was, nor does the proof show that it was by reason of anything that defendant said or did that it was not discovered earlier."

Applying these rules to the case at bar, how stands the case upon the Statute of Limitations? There is no question that there was a well established method of doing business between plaintiff and the firm of Dockery & Hilbert. That method required the furnishing of an abstract of title with an attorney's certificate of title. The attorneys to give the certificate of title were Campbell & Ellison. A deed of trust was to be recorded and forwarded. In this case the money was paid, but no deed of trust, abstract of title or certificate of title from Campbell & Ellison were ever forwarded. The failure to forward the deed of trust within a reasonable time was sufficient within itself to have placed plaintiff upon inquiry. Not only do

we have the plaintiff failing to get the deed of trust, but there is no abstract of title or certificate of the attorneys ever sent to it.

Such failure was sufficient to put any prudent person upon his inquiry. The means of discovering the fraud were at hand had plaintiff been exercising diligence. In such case, *"Knowledge by the defrauded party of facts which in the exercise of proper prudence and diligence would enable him to learn of the fraud, is usually deemed equivalent to discovery."*

.This plaintiff had knowledge of such facts. It had parted with a big sum of money. It was the custom and rule of conduct for it to receive within a very short time after paying its money a deed of trust, an abstract of title, and an attorney's certificate of title. It received neither. Any prudent person with the knowledge of the facts (and the plaintiff knew them) would have begun an inquiry. Not so in this case, however. With knowledge of facts which would place any prudent person upon inquiry it made no attempt to get at the real facts, although the examination of the records would have disclosed the whole fraud. Under the course of business the papers were usually received within a few days. A few days more would have been time for the discovery of the fraud. In law the fraud must be deemed to have been discovered shortly after the usual time elapsed for the delivery of the deed of trust and other papers to the plaintiff. It being so deemed in law, the discovery was more than five years before the institution of this suit. The trial court was right in holding that plaintiff was barred by the Statute of Limitations.

II. Nor will it do to say that the plaintiff was lulled into security by the conduct of Dockery & Hilbert, through Hilbert afterward. After the consummation of the fraud, nothing was done to disarm plaintiff of the suspicion until the payment of interest

one year later. Under our paragraph one the fraud should have been discovered within a few weeks after the act. In law it was so discovered. If in fact the fraud had been discovered within a few weeks the payment of interest afterward would not affect the case. So, too, if the law deems that the fraud was discovered within a few weeks after the perpetration thereof, the payment of interest a year later cannot affect the case. Obviously so, because it would be an act done after the discovery of the fraud.

Time forbids me to go elaborately into all the authorities upon the question discussed in our paragraph one, or into other phases of this case, but I am convinced that the judgment should be affirmed for the reasons above assigned, if not for other reasons. I therefore dissent from the opinion of the majority.

## DISSENTING OPINION.

BROWN, J.—I cannot concur in the opinion written by our learned Chief Justice in this cause.

Under all the facts in this cause, Mr. Woods, the agent of the plaintiff, might have been justified in waiving the delivery to him of an absract of title and the opinion of attorneys thereon, in view of the certificate of Dockery & Hilbert that the title to the land was duly vested in Smith; but according to the testimony of Mr. Woods, it had always been his custom to receive a deed of trust on all loans made by the college through Dockery & Hilbert; and as no deed of trust was sent to him for this loan and he wholly failed to investigate or make any inquiry why said deed of trust was not furnished, I think his gross neglect was sufficient to set in motion the Statute of Limitations.

While Dockery held Hilbert out as his partner for the purpose of making real estate loans, it is not contended that Dockery would have loaned Hilbert $12,000 or any other sum without a deed of trust; nor

do I think his conduct toward the college justified the loaning of money without a deed of trust.

Mr. Woods, the agent of the plaintiff college, was a banker, and I cannot conceive of any more gross neglect of duty on the part of an intelligent agent than to loan $12,000 for four years without security of any kind.

If the plaintiff was some person uninformed in the ordinary rules of business and trusting implicitly in the integrity and skill of an agent, the case would be quite different; but it seems that the plaintiff occasionally sent agents to Missouri to inspect the real estate upon which its loans were made, to ascertain if its money was safely invested, and how it came to loan such a large sum as $12,000 without receiving a deed of trust, and then waited four years before trying to find out why no deed of trust was furnished, is beyond my comprehension.

As I view the matter, the plaintiff was guilty of more gross neglect than the defendant, and the loss should fall upon it.